## McGill's Adoption

*George F. Mahaney*, for petitioner.

*B. H. Marks*, for respondent.

ROWLEY, P. J., February 2, 1944.—This matter is before the court upon petition of Ralph W. Meeks for the adoption of Earl Joseph McGill, a minor over 14 years of age. Petitioner is the husband of Frances Meeks, mother of the minor. The mother and the minor have consented to the adoption. In November 1934, Frances Meeks divorced Earl F. McGill, the minor's father. The father of the child opposes the adoption.

Section 2 of the Act of July 2, 1941, P. L. 229, prescribes the consents necessary for an adoption:

"Consent to the adoption is necessary as follows:

(a) Of the person proposed to be adopted, if over twelve years of age, and of said person's husband or wife, if any;

(b)  Of the adopting parent's husband or wife, unless they jointly adopt such person;

(c) . Of the parents or surviving parent of the person proposed to be adopted, if such person shall not have reached the age of eighteen years, . . . but the consent of a parent who has been adjudged a lunatic or habitual drunkard, or who has abandoned the child, is unnecessary, provided such fact is proven to the satisfaction of the court or judge hearing the petition, in which case such court or judge shall so find as a fact . . ."

Inasmuch as the minor is under 18 years of age, the consent of the father is necessary for his adoption, unless the father has abandoned the child.

Frances Meeks, the mother, divorced Earl F. McGill, the father, in November 1934. Apparently it was agreed at that time that the boy would remain with his mother and that the father would pay the costs of his maintenance. The boy has resided in the City of Sharon with his mother ever since, and until the year 1937 the father, who resided in Bedford, Pa., contributed approximately thirty dollars per month for his support.

Canceled checks offered by respondent established quite regular bi-weekly payments during 1935 and 1936. But there was only one check evidencing any payment in 1937. This was a check for $10 dated August 6, 1937. There were three checks of $10 each in 1938, dated March 6th, August 1st, and August 18th. There was no written evidence of any contribution in 1939 or 1940, but one check in 1941, which check was payable to the boy, and was dated approximately on his birthday. Respondent made some claim that he had remitted funds other than those represented by the checks produced. It is a bit singular that the checks for 1935 and 1936 were preserved while the more recent ones were lost.

The mother testified that the boy's father visited their home once in the year 1936, and that that was

the only visit after the date of the divorce in 1934. The mother has apparently been continuously employed. She stated that she received a letter from her former husband in 1937 wherein he invited the boy to go to Canada on a visit. The latter was a patient in a Youngstown hospital and was unable to go. She testified that in 1941 she received a letter from the father requesting a snapshot of the son, which she supplied, but that she had received no other communication from the father since the divorce.

The father testified that he was permitted to see the child at first, but

"A. Well, after a while I just couldn't see the boy—that's all.

Q. Why not?

A. Why his mother wouldn't permit me to see him.

Q. What efforts did you make to see the boy, Sergeant?

A. I came to Sharon a number of times. I called up on the telephone. I called once from Lewistown—I believe, once or twice—and tried to make arrangements to see him. But in every instance my request was refused."

The foregoing is so vague and indefinite that it is not particularly impressive.

"Q. Did you come to Sharon in 1939?

A. I did.

Q. How did you come here?

A. I flew.

Q. Did you contact your wife before you flew in and after you flew in?

A. I did.

Q. How?

A. By telephone.

Q. When I say 'your wife' I mean the mother of your son—your former wife.

A. Yes.

Q. Tell us how you contacted her.

A. I called her by telephone to arrange to see the boy, calling from Mr. Marks' office on one occasion.

Q. Where else did you call from?

A. Well, I just don't remember. I don't remember where I called from, but that same time I called her from out of town, somewhere.

Q. Do you recall what your wife said to you about seeing the boy?

A. Just now—that's all.

Q. No. Do you recall what your wife said to you at the time about seeing the boy?

A. She said I couldn't see him.

Q. Did she say anything further, as to what she would do if you made any effort to see him?

A. No. I don't remember that she made any further statements. She just simply said I couldn't see him.

Q. And after she refused you permission to see the boy what did you do? Did you have anyone call your wife?

A. Yes, sir. I had you call."

The mother denied that she had ever refused to permit the father to see the boy. She also denied respondent's testimony regarding the telephone calls.

We are not convinced that respondent's visit to Mercer County on this occasion in 1939 was inspired principally by a bona fide desire to see his son.

Respondent was asked by his counsel:

"Q. Mr. McGill, were you able to make any contact with your former wife, either in writing or orally, for the past several years, to find out anything about the welfare or whereabouts of this boy?

A. Oh, yes. Yes, once I wrote to her about a birthday gift—to make a suggestion for a birthday gift, I believe. That was several years ago now, and I received a very nice letter back from her, and she suggested a gift for him which I bought and sent him."

Respondent testified that once or twice he had written to a neighbor for a suggestion for a birthday gift for the boy. This circumstance does not warrant any inference that the mother was discouraging the interest of father and son in each other, particularly in the absence of evidence that any letter to the mother remained unanswered.

Respondent testified that he did not remember whether he visited Sharon between the years 1936 and 1939. Referring to the visit in 1939, he testified:

"A. I remember specifically this one instance. I was invited to come out here. My prime purpose was to come here to see my boy. Mr. Marks had invited me out here for a visit. I don't remember whether any former request was refused or not—I don't remember."

In 1939 or 1940, after respondent's visit to the county, he planned to go to Toronto to enter the air force. He telephoned his son from Lewistown. There is no claim that he had any difficulty in communicating with the boy.

Respondent testified that he maintained two insurance policies upon the minor's life. Apparently there was a weekly premium of 25 cents on each policy. This is a matter of only slight importance which bears not at all upon the boy's maintenance.

The minor testified that he had last seen his father in 1937; that the father had written him four or five times since 1937; that the latest letter was received two years ago; that he had written his father in 1942, to which his father had replied; that the latest letter from his father was written from Cochran Field, Ga., but that the minor did not know whether the father was still at Cochran Field when the letter was received by the son; that he ordinarily received a birthday gift and a Christmas gift from his father, but that no gift was received on his birthday in 1943 nor at Christmas in 1942.

The minor expressed a desire for the adoption so that he might be enrolled in school in the name "Meeks".

Contributions of merely $10 in 1937 and $30 in 1938 indicate respondent's grievous lack of serious concern for the maintenance of his son during those years. The utter absence of contributions in 1939, 1940, 1941, and 1942 is inconsistent with any sense of parental responsibility.

Respondent was unable to state that he had visited Sharon between 1936 and 1939.

We are of the opinion that respondent's failure to visit his son during these years was due to the fact that he was inexcusably delinquent in his contributions rather than to the refusal of the mother to permit such visits.

The statute declares that the consent of a parent who has abandoned the child is unnecessary to authorize his adoption.

In Weinbach's Appeal, 316 Pa. 333, the court defined abandonment as follows (p. 339) :

" 'The statutory notion of abandonment does not necessarily, we think, imply that the parent has deserted the child, or even ceased to feel any concern for its interests. It fairly may, and in our judgment does, import any conduct on the part of the parent which evinces a settled purpose to forego all parental duties and relinquish all parental claim to the child . . .' "

The foregoing definition seems to regard abandonment as including both a purpose to forego parental duties and a purpose to relinquish all parental claim. The question might arise whether the foregoing of all parental duties is in itself an abandonment. There is, of course, room for arguing that relinquishment of all parental claim is to be presumed from failure to perform parental duties.

In Hazuka's Case, 345 Pa. 432, 435, the court reiterated that abandonment may be effected ". . . by conduct evincing a settled purpose to forego all parental duties and relinquish all parental claims."

It is worthy of note, however, that both in Weinbach's Appeal and in Hazuka's Case the contesting

parent by a written instrument had surrendered the child to a charitable institution and had authorized the adoption. There was therefore an express relinquishment of parental claims as well as the failure to maintain.

But the above definition of abandonment was first stated in Denny's Adoption, 11 D. & C. 611, as a quotation from Winans v. Lippie, 47 N. J. Eq. 302. In the Denny case there had been no formal release nor surrender of the child by the parent.

The adoption of a minor child is a serious matter for, by the decree, it is taken from the family of its parent and made a member of another, and, as the decree is practically irrevocable, it should not be entered in the face of objection by the natural parent without careful consideration: Forst's Adoption, 12 D. & C. 739.

The result of abandonment is a surrender and forfeiture by the parents of a natural but not an absolute right—an admission of emancipation. The State is supreme in its power over parents and children, and by the statute has enacted that abandonment strips the parent of his natural right to control and guide the child in its welfare. To hold this right the parent must pay the debt he owes to the child. "He that begets thee, owes thee, and has a natural right over thee."

The inducement to decrees for all adoptions must be the welfare of the child. The State is always interested and concerned for their cultural development, their religious, moral, physical, intellectual and material uplift, and its power to control these cannot be stayed by an arbitrary refusal of consent by a parent who, being able to support his children, has refused to do so and left them to drift: Beech's Adoption, 7 D. & C. 505.

Parental rights to their children are natural but not absolute.

It is unnecessary to say that a court should approach a question of this sort with much caution, as

the natural right of a father should not be taken away from him without sufficient cause, but the adoption statute also requires us to consider the welfare of the child.

Frances Meeks, during the six or seven years immediately past, has reared her son without assistance from her former husband. The appearance and conduct of the boy proclaim that she has done well. In a contest between the rights of the mother and the present right of the father, the latter would pale into insignificance. But the contest here is between the second husband of the boy's mother and his natural father. The welfare of the child requires that he continue in his present environment with his mother. If a decree of adoption in the instant case were necessary to preserve that environment, we should feel warranted in entering it.

Petitioner married Frances Meeks approximately one year ago. He has lived in the home with the boy and the boy's mother only six months because of his service with the United States Army Air Force.

Petitioner's engagement with the Army prevented his attendance at the adoption hearing.

While the court may dispense with the appearance of the adopting parent, we are of the opinion that the court should have an opportunity to observe and hear petitioner before entering a decree.

We are not indifferent to the expressed desire of the boy to be enrolled in school in the name his mother now bears; nevertheless we think the situation is not sufficiently acute to require an immediate decree.

While we decline to enter a decree of adoption at the moment, we do so without prejudice to the right of petitioner to renew his application at some appropriate future time when the instant circumstances may have changed.